Filed 3/30/26  Koi Nation of Northern Cal. v. City of Clearlake CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| KOI NATION OF NORTHERN CALIFORNIA, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> CITY OF CLEARLAKE, et al. <br><br>     Defendants and Respondents. | A172741 <br><br> (Lake County Super. Ct. No. CV424401) |

      This appeal concerns a project to build a public sports complex on a 26-acre parcel in the City of Clearlake that was most recently a walnut orchard.  The City approved the project after adopting a mitigated negative declaration (MND) under the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq., CEQA[1]).  The Koi Nation of Northern California (Koi Nation), a California Native American tribe affiliated with the project area, sought a writ of administrative mandate to require the City to set aside its MND, alleging that the City had violated provisions added to CEQA by Assembly Bill No. 52 (2013–2014 Reg. Sess.) (Assembly Bill No. 52).  The bill created "a new category of resources in [CEQA] called 'tribal cultural

_____

      [1] Undesignated statutory references are to the Public Resources Code. We refer to the CEQA Guidelines (Cal. Code Regs., tit. 14, §§ 15000–15387) as the Guidelines.

resources,' " (Assenbly Bill No. 52, § 1(b)(2)) based on legislative findings that CEQA did not adequately "include California Native American Tribes' knowledge and concerns," which had "resulted in significant environmental impacts to tribal cultural resources" (*id*. § 1(a)(3)). The bill added provisions to CEQA to facilitate consideration of tribal cultural values alongside archaeological ones in identifying projects' environmental impacts and determining how to mitigate them (*id*. § 1(b)(2)); mandated "a meaningful consultation process" between tribal governments and lead agencies so the latter can identify tribal cultural resources and consider "culturally appropriate mitigation and mitigation monitoring programs" (*id*. § 1(b)(5)); and recognized that "a substantial adverse change to a tribal cultural resource has a significant effect on the environment" (*id*. § 1(b)(9)).

Koi Nation appeals from the denial of its petition, arguing that the City violated CEQA in two ways: It did not comply with the tribal consultation requirement, and it prepared an MND, rather than an environmental impact report, even though substantial evidence supports a fair argument that the project may have a significant adverse effect on tribal cultural resources. We hold that, assuming Koi Nation adequately requested consultation, the City fulfilled its resultant duty to consult; it did not abuse its discretion to identify tribal cultural resources; and it did not ignore substantial evidence of a fair argument that the project may have a significant impact on the tribal cultural resources it identified. We thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *CEQA and the Consideration of Tribal Cultural Resources*

CEQA is "designed to provide long-term protection to the environment." (*Mountain Lion Foundation v. Fish & Game Com.* (1997) 16 Cal.4th 105, 112.) One of its "basic purposes" is to "[i]nform governmental decision makers and

2

the public about the potential, significant environmental effects of proposed activities." (Guidelines, § 15002(a)(1).) CEQA generally requires a public agency evaluating whether to carry out or approve a "discretionary project[ ]" (§ 21080, subd. (a)) to prepare "an [i]nitial [s]tudy to determine if the project may have a significant effect on the environment." (Guidelines, § 15063(a).)

If an initial study identifies potentially significant effects on the environment, an applicant can revise its plans to avoid the effects or mitigate them "to a point where clearly no significant effect on the environment would occur." (§ 21080, subd. (c)(2).) If the applicant does so, and "there is no substantial evidence, in light of the whole record before the lead agency, that the project, as revised, may have a significant effect on the environment," the agency may prepare an MND. (*Ibid.*; see § 21064; Guidelines, §§ 15070(b), 15071.) The agency must make the MND available for public review and comment (*id.*, §§ 15072–15073) and, before approving the project, must adopt the MND after considering its contents and any comments. (*Id.,* § 15074(b).)

CEQA has long protected a category of resources that the Guidelines' Environmental Checklist Form, designed for use in initial studies, labels "cultural resources," which includes historical and archaeological resources. (Guidelines, Appendix G, Category V; §§ 15063(f), 15064.5(b)–(d).) As amended by Assembly Bill No. 52, CEQA now states that "[a] project with an effect that may cause a substantial adverse change in the significance of a tribal cultural resource is a project that may have a significant effect on the environment." (§ 21084.2.) The Checklist Form, which the Legislature directed be modified accordingly (§ 21083.09), now includes distinct categories of "cultural resources" (i.e., historical and archaeological resources, as well as human remains) and "tribal culture resources." (Guidelines, Appendix G, Categories V, XVIII.)

1.     *Tribal Cultural Resources (TCR)*[2]

CEQA defines two sets of circumstances in which materials can qualify as tribal cultural resources.  (§ 21074, subd. (a).)  This led the parties in *Koi Nation of Northern California v. City of Clearlake* (2025) 109 Cal.App.5th 815 (*Koi Nation*)[3] to refer to CEQA as creating two categories of TCR: "mandatory" and "discretionary."  We adopted that usage (*id.* at p. 824), but observe now that the distinction is simply a taxonomic shorthand:  While one set of circumstances *mandates* that an agency deem material TCR, and the other gives the agency *discretion* to do so, CEQA draws no substantive distinction in how an agency must address TCR, once it determines they exist, based on whether they qualified by the mandatory or the discretionary route.

With that caveat, we note that mandatory TCR are "Sites, features, places, cultural landscapes, sacred places, and objects with a cultural value to a California Native American tribe that are either of the following: [¶] (A) Included or determined to be eligible for inclusion in the California Register of Historical Resources [(CRHR)]. [¶] (B) Included in a local register of historical resources . . . ."  (§ 21074, subd. (a)(1).)  Discretionary TCR is a resource "determined by the lead agency, in its discretion and supported by substantial evidence, to be significant pursuant to criteria set forth in subdivision (c) of section 5024.1" (section 5024.1(c)), the statute that defines what is eligible for listing as a "historical resource[ ]" in the CRHR.  (§ 21074, subd. (a)(2) (section 21074(a)(2)).)  In determining whether a resource qualifies as a discretionary TCR, a lead agency "shall consider the significance of the resource to a California Native American tribe."  (*Ibid.*)

---

[2] Like the parties, we refer at times to tribal cultural resources as TCR.

[3] While involving the same parties, *Koi Nation, supra*, is unrelated to this appeal and involved a different project altogether.

4

2. *Consultation*

Assembly Bill No. 52 created a notice-and-consultation process to facilitate an agency's consideration of a tribe's "expertise concerning their tribal cultural resources." (§ 21080.3.1, subd. (a).) Before releasing an MND, an agency must notify any California Native American Tribe that is "traditionally and culturally affiliated" with the relevant area and has requested notice of projects. (*Id.*, subds. (b), (d).) If, within 30 days of receiving notice, a tribe makes a written request to consult, the agency must engage in consultation. (*Id.*, subds. (b), (e).)

To define "consultation," Assembly Bill No. 52 incorporated by reference a statute defining it as a "meaningful and timely process of seeking, discussing and considering carefully the views of others, in a manner . . . cognizant of all parties' cultural values and, where feasible, seeking agreement," and requiring that consultation between government agencies and tribes be conducted in a way "mutually respectful of each party's sovereignty." (Gov. Code, § 65352.4; § 21080.3.1, subd. (b).)

CEQA does not prescribe topics for consultation, but provides that if a tribe requests consultation about, among other things, "recommended mitigation measures, or significant effects, the consultation shall include those topics." (§ 21080.3.2, subd. (a).) It may also address "the type of environmental review necessary, the significance of tribal cultural resources, the significance of the project's impacts on the [TCR], and, if necessary, . . . appropriate measures for preservation or mitigation" the tribe may recommend. (*Ibid.*)

A consultation is "considered concluded" after either of two events: (1) the "parties agree to measures to mitigate or avoid a significant effect, if [one] exists, on a tribal cultural resource," or (2) one of the parties, "acting in

5

good faith and after reasonable effort, concludes that mutual agreement cannot be reached." (§ 21080.3.2, subd. (b).) If a tribe timely requests and engages in consultation, an agency may adopt an MND "for a project with a significant impact on an identified tribal cultural resource" only if the consultation has concluded. (§ 21082.3, subd. (d).)

B.    *The Project and Project Area*

The "Burns Valley Development Project" (the project) is slated for development on a vacant 25.46-acre parcel that was most recently a walnut orchard. (We use the term "project area" to refer to the 25.46-acre area defined in the MND.)[4] The eastern two thirds of the project area will have baseball and soccer fields, a recreation center for indoor sports and public events, and a concession stand. The western third will have a public works building and vehicle storage yard.

The parcel's western boundary is a creek known now as Burns Valley Creek, and to the area's original Koi inhabitants as Kuu'lbidai. Miller Creek, now extinct, once bisected the eastern third of the project area on a course roughly parallel to Burns Valley Creek/Kuu'lbidai. The project area is in a floodplain between the two creeks. As a result, most of the area's sediment is alluvial (i.e., deposited by water flow), and the plain has regularly aggraded (i.e., risen in level as a result of alluvial deposits).

In prehistoric times, the project area was in Koi territory, which lay southeast of Burns Valley Creek/Kuu'lbidai. The creek served as a boundary with the territory of the Elem tribe to the north. The Koi political center was

_____

[4] In response to a focus letter we sent the parties before oral argument, the City confirmed at oral argument that the project area is coterminous with APN 010-026-40 and does not include a narrow strip of land that the City developed, before approving the MND at issue, as an access corridor connecting the project area to Olympic Drive ("the access corridor").

6

on an island in the lake. To manage their territory on the mainland—including much of what is now the city of Clearlake—they divided the land into tracts, assigning the right to harvest and steward each tract's resources to a family. The Koi also extensively used obsidian from nearby Borax Lake for toolmaking and trade.

Non–Native American settlers began occupying and likely farming the project area in the 19th century. Its 20th century owners used it as a ranch and orchard, erecting a house, barn, and corral and ripping and tilling the land to a depth of 12–15 inches. In the 1970s, a stormwater retention basin was excavated on the project area's southeast border. Displaced soils were deposited in the southeast corner of the parcel, where its owners later allowed dumping of debris from other construction sites. They also permitted dumping of remote fill in an east–west strip across the south-center of the parcel. Earlier in the 20th century, as part of the foundations of since-demolished farm buildings, fill was dumped in an area straddling the project area's northern boundary, east of center.

C.   *Dr. White's Investigation and Communications with Koi Nation*

The City hired archaeologist Gregory White, Ph.D., to study the project area by reviewing records from the California Historical Resources Information System; examining ethnographic and historical records; coordinating with Koi Nation; archaeologically surveying the project area; documenting potentially affected cultural resources; and evaluating the integrity and eligibility for the California Register of Historical Resources of, and potential project effects on, all such resources.

White spoke with Koi representatives in January 2021. They told him that an Elem man, Batsulwin (Eagle) Brown, had said that some 40 years earlier, when he was a boy in the late 1970s or early 1980s, he had accompanied his

father to a large construction project that had uncovered burials, and he recalled the site as having been in the project area. White searched archeological records for the project area but found nothing matching Brown's account of such a construction project (though he acknowledged that archaeological recordkeeping in that era had been lax). In his February 2021 field investigation, White surveyed the project area with a team including Yolanda Tovar and Rob Morgan, representatives of Koi Nation. Tovar and Morgan led White to the part of the project area Brown had shown them. White's team dug trenches and found no evidence of past construction, disturbed soil, or cultural resources. White described Tovar and Morgan as "satisfied that it is likely [that] nothing is present on the property fitting Mr. Brown's description," yet expressing "caution and concern regarding the reported find."

More generally, White surveyed the full surface of the project area on foot in transects three to six meters apart. A backhoe operator dug 38 trenches that were 8–12 feet long, 2 feet wide, and 4–8 feet deep, removing soil in 4-inch layers so White could identify—and avoid damaging—cultural resources. He identified several parts of the project area that would become the focus of attention: (a) two hitherto-unknown, intact, buried Koi ancestral sites on opposite sides of the extinct Miller Creek channel, with artifacts and fire-cracked rocks indicating that, 3,000 to 5,000 years ago, the Koi had used the sites to make obsidian tools and, periodically, to camp and likely to fish in the adjacent creek, and (b) obsidian flakes and artifacts in construction fill from other locations that had been dumped on three parts of the project area: (1) the southeast quadrant, (2) a south-central strip, and (3) the northeast quadrant between the buried sites.

8

As to the fill, White's report stated, "Surface artifacts, especially Borax Lake obsidian cobble fragments, are common and widespread in the south-center and southeast quadrant of the [parcel], but they are associated with remote demolition and construction fill transported [to] and dumped on the parcel. The surface materials do not qualify as cultural resources and will require no further management measures." By "cultural resources," White meant archeological or historical resources; he did not opine whether the materials constituted TCR. As White would later explain, the materials do not qualify as historical resources because, having been moved from their original locations, they lack the integrity required by regulations implementing the statutory criteria for historical resources. (§ 5024.1(c); Cal. Code Regs., tit. 14, § 4852.)

As for the two buried sites, White concluded that they constitute "significant cultural resources" (again meaning historical or archeological resources). Noting that the sites cover "relatively small areas" and are buried 16–32 inches below grade, White opined that "[n]o further management measures will be necessary if potential impacts to these sites can be eliminated by . . . avoidance or placement of fill."

To avoid a need for "design 'reboots,'" White issued his preliminary report before the City created project plans. He planned to wait to "file a full report incorporating . . . historical research, document review[,] and Native American coordination" until the City was "at the 60-percent design stage," so he could address its "specific design needs." After White's initial report, engineers consulted with him to ensure the project design avoided the buried sites.

In January 2022, the City asked White to prepare a final report. He met with Koi Nation Tribal Chair Darin Beltran and Ms. Tovar. On

9

February 14, White sent the City his 19-page final report, which recommended that the City issue an MND, contingent on implementing mitigation measures to avoid the buried sites. White described: (1) the project; (2) his investigation, with Koi observers, of the project area; (3) his discussions with Koi representatives; (4) his review of (a) ethnographic literature on the Koi, (b) historical materials showing the project area's use since the 1800s, and (c) records of all claimed archeological findings within half a mile of the project area; and (5) his fieldwork findings, including (a) soil types and landforms, (b) the four "large-scale" 20th century "disturbances" of the area (plowing, construction, excavation of a stormwater basin, and placements of remote fill), and (c) his archaeological findings (i.e., the obsidian in remote fill and the buried sites).

White wrote that Beltran and Tovar had "identified no sacred lands or other Tribal heritage resources associated with the Project area" except the buried sites, which they deemed "sacred." White represented that, based on updated project plans he had shown them and "communication of the City's commitment to avoid both [buried] sites," they had "approved the Project moving forward," while asking that the City ensure "the presence of a Tribal monitor during construction for all subsurface excavation of primary soils."

As for recorded archeological sites, White noted that they "are common in Burns Valley" and include both workshops and campsites used by visitors collecting toolstone and settlement sites with "huge inventories" of obsidian production debris. He noted three sites within half a mile of the project area, one "identified by a local resident and amateur practitioner" named Branscomb, who in the 1970s worked with the California Historical Resources Information System's Northwest Information Center to "file records on previously and newly observed Lake County archaeological sites."

Branscomb plotted his locations "based on his memory of more than 700 locations visited [over] several decades," creating brief records that "provide strictly minimal descriptions" and, when "checked professionally," have occasionally proven "partially accurate" but usually inaccurate.

Under "Archaeological Findings," White wrote that the redeposits of obsidian in fill "do not constitute cultural resources," but the buried sites are cultural resources. He plotted the sites' locations within the project area.

Buried site CCL-21-01 is "a non-midden lithic site"—i.e., a site with stone artifacts but without "midden," a type of soil that indicates a "refuse heap which marks an ancient settlement" (Oxford English Dict., "midden," definition 3.a., https://doi.org/10.1093/OED/3186683076, accessed March 24, 2026). "Closely spaced trench probes established well-defined site limits" encompassing about 3,000 square yards (about 0.62 acres). The site is "not evident on the surface" but buried under 16–32 inches of "non-midden soils," and it contains moderately dense "artifact assemblages . . . dominated by Borax Lake obsidian including . . . flakes indicative of early-stage [tool] production." "[P]ossible fire-cracked rock and a few basalt [chips] probably derived from basalt cores and core-tools suggest[] that the site also served a temporary residential function." In sum, the site seemed to be an area where Koi made tools and sometimes camped.

The second buried site, CCL-21-02, is also a "non-midden lithic site" for which probes "established well-defined east-west site limits" encompassing roughly 1,100 square yards (or about 0.23 acres). Buried 20–28 inches below the surface in "non-midden [clay loam] soils," it too has obsidian artifact assemblages indicating "early-stage [tool] production."

White conducted his study pursuant to section 5024.1 and related regulations (Cal. Code Regs., tit. 14, § 4850 et seq.). Those provisions

11

establish the California Register of Historical Resources (CRHR) and set criteria for identifying materials eligible for listing in the CRHR, ensuring their protection as historical resources. To be eligible for listing, White noted, resources must have integrity and must satisfy a section 5024.1(c) criterion; he expressed an opinion that the buried sites are eligible. He did not reach that conclusion about obsidian artifacts and flakes in remote fill deposited on the project area's surface.

Under "Tribal Significance," White noted that the Koi participants in the study expressed interest in the preservation of the buried sites and felt "gratitude and reverence" for them as a "record of tribal heritage." White did not opine whether the sites constitute TCR under section 21074.

D. *Initial Tribal Consultation, Access Corridor Construction, and the MND*

On February 16, 2022, City staff member Adeline Brown forwarded White's report internally and wrote, "I spoke with Bob Geary today, . . . the Tribal Historic Preservation Officer contracted by Koi Nation. . . . [A]lthough we are getting ready to proceed with this project, we really need to follow protocol on this and send him a formal Request for Review, giving him 30 days to [request to] consult . . . ." City Manager Flora asked White his view, adding, "I really don't want to start the process over just because [Geary] is involved now." White replied that "[t]he consultation and tribal engagement process I followed. . . conformed to AB52 best-practices, so I would expect the outcome to be the same."

On February 18, Brown emailed Geary a notification and request for review of the project, addressed to Koi Nation and to the Habematolel Pomo of Upper Lake (HPUL). On February 23, Geary—who serves as Tribal Historic Preservation Officer for both tribes—sent a consultation request. Its text refers only to the HPUL, but it was cc'ed to Koi Nation email addresses.

12

In early March, the City held an Assembly Bill No. 52 consultation with Koi Nation representatives about this project. On March 18, Geary sent the City a followup letter noting "concerns that the project could impact known cultural resources" and asking that the City, among other things, "includ[e] cultural monitors during development and all ground disturbance activities."

Also in March 2022, contractors began work on what some documents call an "initial phase" of the project now at issue: developing the access corridor—including a roadway, parking spaces, and a coffee kiosk— connecting the southern edge of the project area with Olympic Drive to the south. HPUL provided tribal monitoring for construction of the access corridor in spring 2022. The monitors' reports indicate that they found obsidian on the surface of the access corridor and, in one instance, in the project area now at issue, near its southern edge.[5] The monitors removed some materials to storage but never called for work on the access corridor to halt because of a discovery requiring further investigation.

In July 2022, without responding to Geary's March 18 follow-up letter or consulting further, the City published a notice of its intent to adopt an MND for the project and issued its initial study, triggering CEQA's 30-day public-comment period. (§§ 15072–15073.) The City included in the MND a completed Environmental Checklist Form.

In the *Cultural Resources* section of the form, the City described White's investigation and recounted his descriptions of the buried sites and of the lack of need for "management measures" for obsidian artifacts in remote

---

[5] The reports mostly refer to "obsidian," "obsidian flakes," or "pieces of obsidian," but one mentions "a large fist sized oval shaped rock heavily pitted on both ends" that the monitor "believe[d] to be [a] hand tool for chipping [obsidian]," and one mentions "a[n] obsidian scraper."

fill. The City echoed White's view that "No further management measures will be necessary if potential impacts to [the buried] sites can be eliminated by means of avoidance or placement of fill." It listed four mitigation measures: three addressing what to do if work uncovers human or archaeological remains and one stating, "The sensitive site section noted on the project site plan shall not be disturbed during construction and/or maintenance . . . . This sensitive site [comprises] . . . two intact, buried, archaeological sites, CCL-21-01 and CCL-21-02 . . ., [which] can be considered significant cultural resources."

In the *Tribal Cultural Resources* section, the City checked boxes indicating that the project may have an impact on mandatory and on discretionary TCR, cross-referred to the *Cultural Resources* section, and stated simply, "Less than Significant Impact with the incorporated mitigation measure[s]" (i.e., the Cultural Resources mitigation measures).

Koi Nation submitted comments on the MND, asserting that the parties' consultation was not adequate, the City must resume consultation, and its mitigation measures were insufficient.[6] In consultation, Koi Nation asserted, Geary had offered substantial evidence of TCR—comprising a map of claimed archaeological sites in or near the project area, with notations of TCR identified by Koi Nation members during White's investigation, and "verbal testimony," as well as reports of tribal monitors having found "arrowheads, stone tools, and lithics" in the access corridor—none of which the MND addressed. The City's analysis of TCR, the Tribe added, reflected

[6] Koi Nation's comments also challenged the MND's sufficiency as to other CEQA resource categories (lighting, air quality, wildlife, etc.). In court, however, Koi Nation has not challenged the sufficiency of the MND as to any environmental resource but TCR.

14

only an archaeological perspective, not the Tribe's cultural perspective. The Tribe asked that the City add mitigation measures requiring it, among other things, to avoid sensitive areas or to preserve them in place by capping them with culturally appropriate materials, and to have tribal monitors observe all ground-disturbing activities.

The City put the MND on the agenda of a planning commission hearing for September 27, 2022.

E. *Additional Materials Submitted for the Planning Commission Hearing*

In response to Koi Nation's comments, the City augmented the MND's mitigation measures, while White made corresponding changes in a revision of his report. The City added this text to measure CUL-4: "The project as currently designed will not impact sites CCL-21-01 or CCL-21-02. If avoidance and/or preservation in place is not possible, the owner will consider re-design or other measures to avoid impacting resources consistent with CEQA. The owner will contract with tribal monitors for ground disturbance within 100 feet of sites CCL-21-01 and CCL-21-02. The owner and [White] will consult with tribal representatives regarding ground disturbing work within these areas including the designation of a 'reburial' location, if needed."

The City also added three new mitigation measures. Measure CUL-5 required cultural sensitivity training for contractors. Measure CUL-6 noted that buried site CCL-21-01 lies within a part of the project area "slated for a paved parking area" and "situated on the sloping bank of an extinct section of upper Miller Creek." The "[c]urrent engineering plan," Measure CUL-6 added, calls for "vegetation and tree removal," "application of remote fill materials to bring [the site] to a level grade," and "installation of landscaping, drains, and underground utility lines in the area." Measure CUL-6 required "[p]roject revisions in design, location, and operations" within "the footprint of site CCL-21-01, [plus] a 15-foot . . . buffer," and imposed five "[l]imitations

15

to disturbance in this area." Three were requirements to flush cut vegetation and avoid installing subsurface features or planting trees in the area. The other two required capping and filling the area, as follows: "*Fill Cap.* Because CCL-21-01 is a buried archaeological deposit contained in a dense clay loam likely to resist compaction impacts, avoidance can be achieved by placing fill on the site surface"; "*Landscaping Fabric and Fill.* . . . [L]andscaping fabric should be laid over the area of the site to create a boundary between intact soils and remote fill. [¶] . . . [A]n additional minimum 6–12 inches [of fill] . . . should be added to the site area to provide a construction and compaction buffer to protect the deposit." Finally, new measure CUL-7 required similar protections for site CCL-21-02.

Dr. White also added text to his report about two claimed archeological sites that Mr. Branscomb had reported to the California Historical Resources Information System. White found the "conditional locations . . . problematic." As to site C-185, which overlapped site CCL-21-01, the " 'dark soil' identified in Branscomb's brief record" proved not midden but decomposed tree material. "Scattered obsidian . . . in the area," he added, "represent[ed] flakes uprooted or dug up by rodents from . . . site CCL-21-01." As for conditional site C-192, White found "[n]o cultural materials of any type."

Five days before the Planning Commission's September 27 hearing, Koi Nation elicited permission for archaeologist John Parker, Ph.D., to review White's fieldwork, accompanied by White. Parker emailed White on Friday morning, September 23, that he would inspect the sites that afternoon. White replied that he was unavailable on such short notice; Parker then surveyed the site alone.

Parker emailed White that he had "discovered a continuous artifact scatter connecting both sites." White replied: "I found surface obsidian in the

16

same area but when we trenched we found it was surface-only and thus derived from the fill. . . ." He noted that a "pedestrian surface survey is inadequate in a floodplain environment." But acknowledging that "something could be anywhere in any gaps between my trenches," he said the City had approved his proposal to "settle the matter" by providing a backhoe on September 26 or 27 so Parker could "join me to dig in the area you've identified. If we find intact deposits at depth, I will happily concede."

On September 25, Koi Nation requested that archaeologists not use a backhoe to determine if the buried sites are connected, which could destroy cultural resources, but noted that it could accept hand tool use under tribal monitoring. On September 26, White proposed such an approach and requested a monitor, but the Tribe declined to provide one, as the City had not yet signed a monitoring contract with it.

On September 27, Parker issued a report that Koi Nation submitted to the Planning Commission with a letter opposing the MND and proposing a continuance for further consultation. Parker wrote that he had "revisited the site areas reported by Dr. White and confirmed and expanded the site boundaries," finding "no break in surface artifact scatter between the two" sites. "It is *suggested*," Parker wrote, that the "two sites *may be* a single site with areas of artifact concentration." (Italics added.)

Parker "agree[d] with Dr. White's recommended mitigation plan" to protect the sites but would "expand" it to require that both an archaeologist and a tribal monitor "direct the placement" of the recommended fabric and fill, and then monitor any later "trenching, grading, or drilling into the fill." Notably, Parker did not recommend mitigation measures for obsidian

17

artifacts and flakes on the surface of the project area. Nor, like White, did Parker attribute any significance to Branscomb's conditional sites.[7]

On September 27, after hearing from city staff, Drs. White and Parker, Tribal Chair Beltran, Tribal Historic Preservation Officer Geary, and the Tribe's attorneys, the Planning Commission continued its hearing on the MND for staff to conduct further consultation.

F.    *Renewed Consultation*

The parties' renewed efforts at consultation began with an October 12 meeting including Koi Nation's Chair, Vice Chair, Secretary, Tribal Historical Preservation Officer Geary, attorney Holly Roberson, and Dr. Parker, and the City's Mayor, City Manager, City Attorney, Public Works Director, Planning Commission Chair, and Dr. White.

According to the City's meeting notes, White said that his findings show two sites seasonally used for toolmaking and fishing, and that it would be reasonable to further investigate the area between them. Roberson, noting that the law favors avoiding impacts on cultural resources, asked if the parties could avoid further subsurface investigation. She advocated a cap-and-fill approach to protect the site(s), but City Manager Flora responded

_____

[7] White had emailed Parker that he "surveyed and trenched" a Branscomb site near the project area "and found nothing whatsoever, which in my experience is the usual outcome for the C-sites" (i.e., sites the Northwest Information Center (NWIC) had recorded conditionally, without assigning the trinomial numbers required for eligibility for the California Register of Historical Resources (Cal. Code Regs., tit. 14, § 4853(b)(3) & App. A)). White had not addressed the C-sites in his initial report, he wrote, because given "the poor quality of . . . Branscomb's records," he "didn't think they rose to the level of discussion." Parker—Koi Nation's expert—replied, "*I completely agree with your Branscomb evaluation. I have had to revisit many of his 'sites' and found very few to be cultural deposits. . . . I can't believe that NWIC actually plotted those on their maps.*" (Italics added.)

18

that the City had to identify the sites' boundaries to cap and fill. The Tribe proposed using ground-penetrating radar to do so, but White, noting that radar might not find buried artifacts, advocated probing with a four-inch auger. In addition, Koi Nation representatives claimed that the project area is within a tribal cultural landscape (§ 21074, subd. (b)), and Flora requested proof of its boundaries. (See *ibid.* [cultural landscape can be TCR to the extent it is "geographically defined in terms of . . . size and scope"].) Flora also noted that the City had hired consultant Lisa Westwood, who thereafter served as a facilitator for the parties' consultation.

After the meeting, Roberson sent the City Attorney a redline showing many proposed revisions to the draft MND's cultural resources mitigation measures to adapt them into parallel measures protecting TCR. Roberson also sent maps she described as defining a "tribal cultural landscape," but which in fact show a "Koi Nation Monitoring Area" seemingly encompassing all of the former territories of the Koi, Elem, and a third tribe around Lower Lake, including the entire city of Clearlake and large areas beyond.

Roberson's revisions expanded the mitigation measures from 7 to 12. They required the City to (1) halt construction within a 100-foot radius, if it finds TCR, until Geary investigates; (2) have White define the boundary of the project area's TCR and archaeological resources—using only hand tools, under Koi monitoring—and then cap that area with geotech fabric covered by clean, engineered fill deep enough to ensure the project will not affect the resources; (3) follow the law governing any discovery of human remains (§ 5097.98)[8]; (4) hire tribal monitors for any ground disturbance in the project area (and not only, as the draft MND stated, within 100 feet of sites

---

[8] Detailed provisions govern this obviously important, sensitive issue (see § 5097.98), and it was never a point of dispute in this case.

19

CCL-21-01 and CCL-21-02) and designate an onsite location to rebury any TCR found; (5) hire Geary to train contractors involved in ground-disturbing work in tribal cultural sensitivity; (6) avoid or cap-and-fill site CCL-21-01 with clean, engineered fill, with White and Koi Nation monitors to jointly oversee the capping and filling as well as any later trenching, grading, or drilling into the fill; (7) similarly cap-and-fill site CCL-21-02; (8) in landscaping, prioritize plants culturally significant to the Koi; (9) give the project a name chosen by the Tribe; (10) consult with the Tribe to create interpretive signs; (11) let the Tribe host cultural events in project facilities for free; and (12) not remove cultural soils from the project area or import soils other than clean, engineered fill—with Geary, consulting with White, to identify what qualify as "cultural soils."

The parties agreed to meet again on October 20. That morning, Westwood sent Koi Nation counsel Roberson a draft in which City staff had adopted many of her edits. The City's draft revealed several disagreements. It required monitoring "for all ground-disturbing activity associated with project construction within 100 feet of the area" containing TCR, whereas the Tribe had sought monitoring "for any ground disturbance on the project site." The parties also differed on the extent of the Tribe's naming rights and the relative authority of Geary and White to identify "cultural soils."

At the October 20 consultation, Geary stated that the project area's location and density of culturally significant plants, along with scientific data and traditional knowledge, raised "a good possibility that something is there" beyond the buried sites. Koi Chair Beltran recommended capping and filling the full 25-acre project area, but the Mayor noted that this would eliminate drainage. The discussion shifted to capping and filling the buried sites and the area between them.

20

Over the next six weeks, the parties exchanged, via Westwood, three rounds of edits and comments on the draft mitigation measures. They reached agreement on many measures, yet continued to disagree on a few, including project naming, who should determine what soils qualify as "cultural soils," and whether the City would use Koi Nation's "[TCR] Treatment Protocol" or draft its own "[TCR] Preservation Plan." Moreover, the City consistently proposed to use tribal monitors for ground-disturbing activity above or near the buried sites plus a buffer zone, and it gradually increased its offer as to the *size* of the buffer, but the Tribe consistently sought monitoring on all ground-disturbing activity throughout the 25-acre project area.

On December 2, Westwood emailed Roberson that the City had accepted the "vast majority" of Roberson's latest edits, and she attached "redlined mitigation measures" and a proposed "monitoring area map." The redline showed significant disputes remaining over only four topics, including tribal monitoring. On the other three topics, the City made only modest edits to Koi Nation's last proposals. As for monitoring, the City again rejected the Tribe's insistence on monitoring the full project area. It instead proposed to hire monitors for "all ground-disturbing activity . . . within the monitoring area depicted on [a] confidential Tribal Monitoring Map" (the "December 2022 Tribal Monitoring Map"). The attached map shows a monitoring area encompassing the buried sites, the area between them, the Miller Creek channel, and a 100-foot buffer around those areas.

On February 15, 2023, Tribal Chair Beltran responded to the City's draft. "We are close to an agreement," he wrote, noting the Tribe's view that the buried sites are two parts of one former "village" through which Miller Creek ran, and offering these comments, among others, on the mitigation

21

measures: The entire project area "must have tribal monitoring during all ground disturbing site work; [¶] The entire area of the Village site [i.e., the buried sites and area in between] plus an adequate buffer zone needs to be capped and filled, including the area of the creek running through [it]. The size of the buffer zone should be agreed on in consultation now, . . . as deferred mitigation is inappropriate under CEQA."

On March 21, the City responded with a letter declaring, pursuant to section 21080.3.2, subdivision (b)(2), that consultation had concluded. After having made reasonable efforts in good faith, City Manager Flora wrote, the City did not feel that "continued consultation on the mitigation measures regarding the extent of tribal monitoring and the size of the capped area will result in mutual agreement."

G. *The 2023 Public Review and Hearing Process*

1. *Final Planning Commission Hearing (April 25, 2023)*

The City put the revised MND on the April 25 Planning Commission agenda. The MND included the Cultural Resources mitigation measures from September 2022 (see pp. 15–16, *ante*) and new TCR mitigation measures. The latter were simplified versions of the draft measures exchanged in the renewed consultation. They read: "[TCR-1]: Requirement to develop a [TCR] preservation plan that delineates the boundary of CCL-21-01 and CCL-21-02, describes the appropriate combination of materials and culturally sterile fill in capping, provides landscaping specifications that favor culturally important plants, and restricts certain types of post-project activities in or on the cap. [¶] [TCR-2]: Requirement to designate a project reburial area [for any] materials . . . discovered during construction. [¶] [TCR-3]: [Training requirement for contractors.] [¶] [TCR-4]: Requirement for tribal monitoring during ground disturbing activities in sensitive areas of the project area.

22

[¶] [TCR-5]: [Compliance with state law on human remains]. [¶] [TCR-6]: A prohibition on the removal of cultural soils from the project area." As adopted, the TCR section of the MND also incorporates by reference the seven Cultural Resources mitigation measures (see pp. 15–16, *ante*).

On April 24, Koi Nation's attorney Roberson sent Westwood "proposed revised mitigation measures *which, if the City agrees to include, would allow the Tribe to agree that the MND mitigates impacts to less than significant.*" (Italics added.) Of the four proposals the City had rejected in the fall, Koi Nation dropped three. The one on which it still insisted was to delete the phrase "sensitive areas of" from measure TCR-4 (requiring "tribal monitoring during ground disturbing activities in sensitive areas of the project area"), so that it would without limitation require "tribal monitoring during ground disturbing activities in the project area."

Roberson attached maps of the project area and its environs on which Geary had (1) shaded the part of the project area in which the City had proposed, in the December 2022 Tribal Monitoring Map, to pay for monitoring, (2) added blue and yellow dots respectively labeled "Dr. Parker TCR Discoveries" and "Tribal Monitor TCR Discoveries," and (3) cross-hatched areas representing Branscomb conditional sites (see pp. 16 and 18, fn. 7, *ante*). Of the blue dots representing claimed TCR discoveries by Parker, all but one were within the area designated for paid tribal monitoring in the December 2022 Tribal Monitoring Map. The one blue dot outside that area was in a location Parker had not in fact surveyed, and reflected an apparent error.[9] Of the yellow dots ("Tribal Monitor TCR Discoveries"), most were

---

[9] This dot reflects a misreading of Dr. Parker's map, mistaking a symbol depicted in Parker's map *legend* for a symbol marking a discovery. Parker surveyed only parts of the project area, and an image in his report makes clear that he did *not* survey the area where Geary, in the map he

23

*outside* the project area. Three yellow dots represented the above-described discoveries of obsidian flakes or artifacts or related materials during the spring 2022 construction of the access corridor (see p. 13, *ante*). Of those three dots, two were in the access corridor, which, as we have confirmed, is not part of the project area for the MND. As for the one yellow dot reflecting a discovery made within the project area during construction of the access corridor, Geary did not identify the discovery or explain why it was sufficiently significant to constitute "TCR." The only claimed archaeological site within the project area, finally, was a Branscomb conditional site, which both parties' archaeologists agreed is insignificant. (See p. 18 & fn. 7, *ante*.)

Koi Nation Tribal Chair Beltran commented on the MND. In consultation, he acknowledged, the parties had "made good progress," and "the amount of mitigation" had increased. "Unfortunately," he added, "*the parties have not reached an agreement due to an impasse over the extent of necessary tribal monitoring for the Project*, which is necessary because of extensive [TCR] present or likely to be present" in the project area. (Italics added.) Stating that the City "has indicated that tribal monitoring is too expensive" but "does not even have an estimate of costs," he noted that the Tribe was willing to "do it at or below cost."

At the hearing, Koi tribal monitor Rob Morgan noted "whispers going around town that we're trying to stop this [project]" and said, "All we're

_____

created, placed the lone blue dot that represented a "Parker TCR Discover[y]" that was within the project area, yet outside the December 2 proposed monitoring area. Geary placed the dot on his map in a spot corresponding to the place where Parker, on *his* map, had superimposed *a legend defining the symbols he used*. Parker had put the legend in a corner of his map that was irrelevant to his report because it showed an area *he had not surveyed*. Parker did not report finding any artifacts in locations that were within the project area but outside the December 2 proposed monitoring area.

24

asking is to . . . have a tribal monitor." Describing how the Koi had "for thousands of years" intensively used land by waterways like the project area's two creeks, he called it "crazy" to assume there was no further TCR buried in the project area between the waterways. Geary noted that the buried sites were in a "prime spot" and recounted how, in another recent project (not at issue in this appeal), the City thought that TCR were confined to one part of the project area, yet Koi monitors found what he claimed were TCR elsewhere in the project area. Noting the present plan to monitor only "the area where they've already found something," he added, "Our concerns are in the areas where they haven't found anything."

Koi Nation's attorney Roberson stated, "[w]e got very, very close in consultation," but "did not come to agreement on . . . tribal monitoring for the whole project site." Noting the proposed edits to the mitigation measures, she reiterated, "[t]he big thing that we didn't agree to, of course, is monitoring." When a planning commissioner asked her if "the only thing separating our two sides at this point is having some monitors on-site during all . . . excavation." Roberson replied, "There's more track[ed] changes than just the tribal monitoring," but "the other stuff is really small." "[S]hort answer to your question," she concluded, "is the main issue, yes, is monitoring on the whole . . . site."

.        The City Manager explained that staff's view primarily reflected not fiscal concerns, but sound planning principles: "It's been . . . [posited] that the City is resistant to a larger scope of tribal monitoring because of the financial impacts—and that certainly is one consideration because . . . we have pretty limited resources." But in any event, he stated, "We don't believe that every ground-disturbing project in the city . . . should require tribal monitoring and that's why, for a number of years now, we've done extra work up front . . . .

25

[W]e do more upfront work than a lot of agencies . . . because we want to identify and avoid impacts to [TCR] . . . as early as possible. [¶] [I]f we were to simply rely on tribal monitoring as a mitigation measure, we would design a project with very little input.  We would go start building . . . [with] tribal monitors[,] . . . run into stuff[,] . . . and [have to] stop and . . . redesign[,]  and . . . that's not the way we want to do things."  The city is obliged, he added, "to base these mitigation measures under CEQA on the facts . . . presented to us," and staff believes "that the mitigation measures . . . adequately mitigate the impacts that we have information about."

With regard to paid tribal monitoring, the City Manager noted that there had been "some concern . . . that there was a larger connected site, rather than two separate ones, and so we've included . . . monitoring in . . . that whole area between the two [buried] sites," and, given "concerns about what used to be . . . known as Miller Creek . . . [and] the possibility of something there, also monitoring in the area around the creek."  This description of the paid tribal monitoring area matched the area shown on the December 2022 Tribal Monitoring Map, rather than the area described in the text of the proposed MND and Conditions of Approval (which was limited to the two buried sites and a 100-foot buffer zone around each).

The Commission adopted the MND.

2.      *Initial City Council Appeal Hearing (June 7, 2023)*

Koi Nation appealed to the City Council.  Its appeal letter stated that the parties "have not reached an agreement due to the City declaring an impasse over the extent of necessary tribal monitoring," and it asked the Council either to continue the appeal hearing for more consultation or to direct staff to prepare an environmental impact report (EIR).  It claimed that the Tribe had "presented substantial evidence of onsite TCRs, which have not

been fully analyzed," and that the City had not created a confidential TCR appendix with the Tribe's evidence and the City's analysis thereof.

On the day of the appeal hearing, the City issued errata to the MND. Among other things, the errata state that the City had added to the MND's attachments a "Confidential TCR Appendix" (though it apparently did not do so). The City also submitted memos from its CEQA counsel, who analyzed its compliance with Assembly Bill No. 52, and from Dr. White, who rebutted Dr. Parker's "suggest[ion]" that the buried sites "may" be a single site.

At the hearing, White explained his view as an archaeologist of the fill's significance: "it wasn't originally deposited there, but it's not to say that there aren't cultural materials in that foreign fill. There are indeed. [¶] But . . . I'm constrained . . . to evaluate these resources under CEQA regulation[s], which means the first threshold that I have to look at [to assess] significance is whether these resources have integrity; integrity of location, integrity of context." Analogizing to "police collect[ing] evidence on a crime scene" who "don't want you going in there and picking up stuff and moving it around and bringing in stuff from elsewhere," he said that an archeologist has "the same need when they evaluate evidence. I can't look at things that are transported from miles away—sometimes I don't know from where—and make any sense out of it or find any meaning. . . . [I]f it lacks integrity, it does not qualify as a historical resource, under California law. [Those] are the legal constraints on the way I look at the record."

Koi Nation's Tribal Historic Preservation Officer Geary stressed the Tribe's view that soils moved to the project area contain TCR. Attorney Roberson argued that, because the Koi used resources in and near the creeks that border and bisect the project area over millennia of seasonal habitation, "there could be . . . [TCR] anywhere on the project site." The Tribe's proposed

27

revisions to the mitigation measures, she said, "do two things," of which "the most important . . . to the tribe" is to require "monitoring on the whole project site," and the other is to incorporate tribal knowledge "on an equal footing" with archaeological knowledge for decisionmaking in the field about unexpected discoveries. "We're . . . 85 percent of the way to an agreement," she urged; "it's two more things and then we're done[:] just extend that buffer zone for monitoring to the site boundaries" and "inclu[de] tribal knowledge for decisionmaking in the field."

Dr. White then summarized his new memo rebutting Dr. Parker's report: the area between the buried sites where Parker found surface obsidian artifacts and flakes, leading him to suggest that the two sites "may" be one large site, White wrote, "corresponds precisely to the location of the 1940s barns where I did identify surface archeological material contained in foreign fill," which in White's view "did not . . . qualify[] as a historical resource under CEQA because it was transported material."

White next stressed a difference that "runs through" the case between "how I look at it as an archeologist under the legal framework . . . to identify heritage resources" and how TCR "are defined." Geary had conveyed "the notion that the treatment of those resources contained in those redeposits should be understood . . . within the tribe's heritage sensitivities," White said, "and I understand and support that notion." As for the nearby City project site Geary had discussed where Koi monitors found artifacts outside the area White had deemed sensitive (a project not at issue in this appeal or part of the project area), White explained that the artifacts were in transported material that "lacked integrity, much as the transported materials in the . . . [project area] lack integrity and therefore, didn't require additional archeological protection measures." But the Tribe's "concerns pertain to the cultural

28

materials . . . within those transported materials," and "[a]s an archeologist, . . . [I] don't speak to the issue of [TCR], which is the province of the tribe under AB 52."

Councilmember Slooten and Dr. White later explored that distinction. Slooten asked whether any materials in the fill would have been "disturbed and ground up" and thus not significant, and White explained that, under the CEQA guidance he follows, "[t]he first threshold for determining significance . . . is integrity, and those deposits lack integrity and therefore . . . don't represent historical resources." Materials have integrity, he added, if they have "not been moved . . . [or] heavily disturbed." Slooten asked if the fact that the fill came from elsewhere meant it had been disturbed, and White said that it lacked integrity. But White added that the integrity requirement "is exclusive to the archeological interpretation"; that "AB 52 gives the tribes agency in defining the nature of [TCR]," and he could not define what are TCR; that the Koi said that they "perceive the foreign fills containing . . . cultural materials, as a TCR"; and that he wanted the Council to be aware of that distinction. In rebuttal, Koi Nation's counsel urged the Council to respect the TCR on site "whether they be there in the ground . . . [or] from redeposits. [¶] From the tribal perspective, that's not the consideration."

A councilmember, alluding to Koi Nation's offer to resurvey the project area "for free" after a recent disking, asked if the Tribe was willing, during construction, "to provide monitors at your cost on the rest of the site and then we'll . . . pay for the monitors [at the buried sites]." An ensuing colloquy with Tribal Chair Beltran seemed to portend a compromise on those lines, but after Roberson reminded Beltran that the Tribe's full government was not present, he asked the Council to continue the hearing so he could present the matter to them, and the Council did so.

29

### 3.    *Final City Council Appeal Hearing (June 15, 2023)*

Before the continued hearing, the City modified draft measure TCR-4 to read, "The City shall invite [Koi Nation] to participate in tribal monitoring during ground-disturbing activities in the project area.  Monitoring shall be required during ground-disturbing activity within 50 feet of the known cultural resource/TCR locations referenced in [White]'s Cultural Resources Investigation, and the monitors selected by the tribe shall be paid for monitoring of these sensitive locations during this ground-disturbing activity. In addition, the Koi shall be allowed the opportunity to observe—on an unpaid, volunteer basis—during ground-disturbing activity on other, non-sensitive areas of the project site."  The Tribal Council declined to provide monitoring without pay outside the buried sites, and the Tribe submitted a new declaration by Geary.

Geary's declaration identified the fill as an "example of the distinction between how an archaeologist and tribal cultural practitioner view[] a site." Dr. White "did not view cultural obsidian and other materials within such fill as historic cultural resources since it had been imported and disturbed and contained items which were not intact," but "[w]hile this may (or may not) be correct from an archaeological standpoint, I . . . [believe] that the imported materials do constitute [TCR] warranting protection under CEQA.  The fact the soils may be disturbed or imported does not negate the character of individual [TCR] contained within it."

During the hearing, the Mayor asked the City Manager for an overview of "what tribal resources we have used for monitoring or what monitoring we've done in the project [area]."  The City Manager replied that, "[t]hrough further consultation with the tribe, there was some feeling that maybe this was one larger site, rather than two smaller sites" and that, while White

30

disagreed, "in an effort to accommodate the tribe's concerns," City staff "agreed to providing monitoring for . . . any work above those sites and a hundred foot radius around the border of those sites" and "further agreed, based on the tribe's concerns, to include tribal monitoring of the area between the two sites" and to "provide monitoring along the creek," with a "hundred-foot" buffer. As at the Planning Commission hearing, this description of the paid tribal monitoring area matched the December 2022 Tribal Monitoring Map, not the text of the proposed MND and conditions of approval.[10]

The Council denied Koi Nation's appeal and approved the MND.

H.    *Proceedings in the Trial Court*

Koi Nation petitioned for a writ of administrative mandate to challenge the approval. In October 2024, the trial court heard argument on the petition and, 12 days later, read a statement of decision denying it that ran to 73 pages of transcript. The court held that Koi Nation had not timely requested consultation (§ 21080.3.1, subd. (b)) and that, even if it had, the City had properly declared consultation concluded because of an impasse. The court rejected Koi Nation's claims that the City did not adequately investigate the project's potential impacts on TCR; ignored substantial evidence of the existence of TCR; rejected feasible mitigation measures; and failed to consider cumulative impacts. The court made comments reflecting its understanding that the City would provide paid tribal monitoring in the full area shown in the December 2022 Tribal Monitoring Map. Koi Nation appealed.[11]

---

[10] The December 2022 Tribal Monitoring Map is in the Confidential Supplemental Administrative Record at page 18118.

[11] In its brief on appeal, the City argued, inter alia, that Dr. Parker's report suggesting that the two buried sites might be a single, larger site (see p. 17, *ante*) "became effectively irrelevant when the City agreed to fully

## DISCUSSION

A.    *General Standards of Review*

We review only whether the City prejudicially abused its discretion under CEQA, meaning that it did not proceed in a manner required by law, or it made a finding unsupported by substantial evidence.  (§ 21168.5.)  "Judicial review of these two types of error differs significantly:  while we determine de novo whether the agency has employed the correct procedures, 'scrupulously enforc[ing] all legislatively mandated CEQA requirements' [citation], we accord greater deference to the agency's substantive factual conclusions."  (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 435.)  Our review "is the same as the trial court's:  [we review] the agency's action, not the trial court's decision." (*Id.* at p. 427.)

If that review requires us to interpret a statute, we must " 'determine the Legislature's intent so as to effectuate the law's purpose.  We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the

---

protect the Buried Sites *as if* they were a single site."  At oral argument, in response to a question we raised in a focus letter sent to the parties before oral argument, the City represented via counsel that, with regard to the discrepancy between (1) the text of the MND and conditions of approval, on one hand, and (2) the City Manager's comments to the Planning Commission and City Council, the trial court's understanding, and the City's above-noted argument on appeal, on the other hand, the City was "unequivocally" committed to providing paid tribal monitoring for ground-disturbing activity in the full area shown on the December 2022 Tribal Monitoring Map found at page 18118 of the administrative record in this case (i.e., the area above the two buried sites, the area between those two sites, the channel of former Miller Creek, and a hundred-foot buffer around that entire area).  This court conditions its affirmance of the judgment on that representation.

statutory framework as a whole in order to determine its scope and purpose and to harmonize the various parts of the enactment. If the language is clear, [we] must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, [we] may consider other aids, such as the statute's purpose, legislative history, and public policy.' " (*Koi Nation, supra*, 109 Cal.App.5th at p. 836.)

B.    *CEQA's Consultation Requirement*

Koi Nation contends that it adequately requested consultation, and the City prematurely declared the consultation concluded based on a false claim of impasse. The City responds that Koi Nation never triggered a duty to consult, as Geary's request did not say it was on Koi Nation's behalf, and that, in any event, the City did adequately consult. While we are inclined to find the request adequate, we agree in any event that the City fulfilled its duty to consult, making the adequacy of the request moot.

Following its request, Koi Nation contends, the City did not lawfully conduct or conclude the consultation. Initially, the Tribe asserts, the City met with Geary just once, did not respond to information he shared or mitigation measures he proposed, and did not further engage the Tribe. But then the Planning Commission directed staff to consult further. Koi Nation acknowledges that the City then engaged more fully in the process, and the parties made progress in fall 2022 in mitigating potential impacts on TCR— until, in its view, the City again ended consultation prematurely. The City responds that it consulted in good faith, made many concessions resulting in new mitigation measures, and declared an impasse only after negotiations had effectively narrowed to whether the City would pay for monitoring all

25 acres of the project area, and the parties entrenched on that issue. As set forth below, we agree with the City.

"[C]onsultation means the 'meaningful and timely process of seeking, discussing and considering carefully the views of others, in a manner that is cognizant of all parties' cultural values and, where feasible, seeking agreement.'" (*Koi Nation*, *supra*, 109 Cal.App.5th at p. 840, quoting Gov. Code, § 65352.4, italics omitted.) A party may declare consultation concluded if, "acting in good faith and after reasonable effort," it "concludes that mutual agreement cannot be reached." (§ 21080.3.2, subd. (b)(2).) As we have described in detail, the City convened and its highest-ranking relevant officers attended two consultation meetings in mid-October 2022, for which its notes reveal meaningful discussion of a wide range of topics. From then through December 2, its staff and Koi Nation's counsel exchanged three rounds of detailed, substantive edits and comments on a dozen draft mitigation measures. (See p. 21, *ante*.) The City accepted many Koi Nation proposals at the outset of the exchange, steadily compromised and accepted other proposals, and sent a draft on December 2 reflecting only four significant differences with the Tribe's positions. (*Ibid.*)

Of those differences, the crucial one—whether to require paid tribal monitors only in the area of the buried sites and a buffer zone, or throughout the 25-acre project area—had persisted from the outset. And while the City had repeatedly increased its offer—from monitoring "within 100 feet of [the buried] Sites"; to monitoring within "a 100-foot radius of [the buried sites] plus the area in between,"; to monitoring in the buried sites, the area in between, Miller Creek channel, and a 100-foot buffer around *all* those areas, as shown in the December 2022 Tribal Monitoring Map—the Tribe unvaryingly insisted on monitoring the full 25-acre project area. After the

34

City declared an impasse, the Tribe submitted proposed edits to the Planning Commission that would, if accepted, end its opposition to the MND. While dropping three terms that had divided the parties, it renewed without change its monitoring demand.

The City was thus justified in writing that, after acting "in good faith with reasonable effort," it did not feel that "continued consultation on the mitigation measure[] regarding the extent of tribal monitoring . . . will result in mutual agreement." Koi Nation's current, contrary argument is surprising given that, at the time, it expressed the same view: As noted, Tribal Chair Beltran wrote the Planning Commission that "the parties have not reached an agreement due to an impasse over the extent of necessary tribal monitoring." The Tribe's effort on appeal to liken this case to *Koi Nation*, *supra,* in which the record lacked "evidence that either party had adopted an entrenched position or that the parties had reached an impasse" (109 Cal.App.5th at p. 841) thus fails: this record has ample evidence of the Tribe's position on the extent of monitoring, which yielded, as its own Chair wrote, an "impasse."

Koi Nation makes several other unpersuasive arguments as to why the City's renewed consultation efforts were insufficient. The first is that the City did not schedule meetings quickly enough, and that the Mayor responded to the Tribe's proposed agenda for the first meeting in a way that was rude and assertedly unlawful.[12] But the City hosted two consultation meetings, attended by high-ranking officials and staff, within four weeks of

---

[12] Koi Nation cites to an exchange in which its attorney Roberson sent the City a detailed agenda and the Mayor replied only, "We will use the City's agenda not yours." But City Manager Flora then sent a "simplified version of the agenda" and added that the City was "willing to discuss any of the items the Koi have identified."

the Planning Commission's directive, and Koi Nation does not claim the City ever in fact refused to discuss any topic.

Koi Nation also contends that, after making progress in October and November, the City "returned from the winter holidays and reverted to its uncooperative stance." But while the City did not promptly respond to the Tribe's December requests to schedule a further meeting, it was awaiting a response to its latest draft mitigation measures.[13] The record shows the City made reasonable, good faith, and in many ways successful efforts to reach agreement on many topics by meeting and exchanging drafts over several weeks of consultation before concluding—after the Tribe rejected for a third time a proposed expansion of the monitoring area and did not modify its own position—that the parties had reached an impasse.

Koi Nation argues that the holding in *Koi Nation* applies here, based on our statement that consultation "requires 'seeking agreement' where agreement is 'feasible.' " (*Koi Nation, supra,* 109 Cal.App.5th at 841, quoting Gov. Code, § 65352.4.) To show that reaching agreement remained feasible, Koi Nation relies exclusively on "[o]ne example" that assertedly "proves the point." The example is that the City allegedly declared, after ending consultation, that it " 'would not be able to do the project if we had to have a monitor there every bit of that project,' " yet "admitted during the same hearing that it did not actually know how much tribal monitoring would cost." According to Koi Nation, the City "simply declared—without evidence or

---

[13] Roberson had asked Westwood on December 6 for a copy of the City's notes on the consultation meetings, to aid review of its December 2 draft, and had proposed further consultation dates. When Westwood replied that the City wanted "to revisit this right after the new year's holiday," Roberson had requested dates in January. On January 13, 2023, Westwood sent Roberson the City's meeting notes. Koi Nation did not then reply to the City's December 2 draft until February 15.

36

analysis—that needed mitigation for TCR was too costly and ended consultation without seeking agreement . . . on actual costs."

The quoted comment about feasibility, however, was made not by the City in declaring consultation concluded, but by one City Council member to explain to the public that member's intent to vote to approve the MND. Koi Nation does not show that the City Council as a body acted on that basis or—more importantly—that the City ever agreed that full-site monitoring was "needed," yet nonetheless rejected it as too expensive.

More broadly, Koi Nation's claim about unexplored costs fails because the City disavows, on appeal, any attempt to justify its determination that consultation had concluded on the basis that the parties reached an impasse about the *cost* of monitoring. Instead, the City contends, "the [full-site-monitoring] measure was rejected, first and foremost, because it was unwarranted," because CEQA requires mitigation only if "there is a potentially significant impact," and "there were no TCR beyond the Buried Sites," so "there was no evidence of a significant impact."[14] As set forth in the following section, the record supports the City's position.

---

[14] Koi Nation's opening brief cited authority that a finding of economic infeasibility must rest on substantial evidence (*Center for Biological Diversity v. County of San Bernardino* (2010) 185 Cal.App.4th 866, 884–885) and that "[t]he fact that an alternative may be more expensive . . . is not sufficient to show that [it] is financially infeasible," absent evidence that "the *additional* costs . . . are sufficiently severe as to render it impractical to proceed" (*Uphold Our Heritage v. Town of Woodside* (2007) 147 Cal.App.4th 587, 599). The City does not dispute either point. We thus take its statement that it rejected full-site monitoring "first and foremost, because it was unwarranted," coupled with its choice not to marshal evidence on appeal to justify a finding of a cost-based impasse, as an implicit concession that the only basis on which this record enables us to uphold its MND is if substantial evidence supports its rationale that the project area contains no TCR beyond the buried sites, so as to justify its finding of an impasse regarding the need for monitoring beyond those sites.

C.     *The Propriety of Adopting a Mitigated Negative Declaration*

Koi Nation claims there is a fair argument that the project may have adverse effects on TCR that the MND's mitigation measures do not reduce to insignificance.  This contention raises two subsidiary questions: (1) Does substantial evidence support the City's determination as to what TCR are present, and (b) if so, does substantial evidence support a fair argument that the project will have potential impacts on those TCR that the mitigation measures fail to reduce to insignificance?  The answers, as set forth below, are Yes and No, leading us to affirm the judgment.

1.     *The City's Identification of TCR*

a.     *Standard of Review*

The parties grapple on appeal over how to define the framework within which we will resolve their disputes.  The City seeks to focus on whether it abused its discretion in making the threshold determination of what TCR are present in the project area—a determination that it contends we review under the deferential substantial evidence standard.  Koi Nation tries, in two ways, to instead trigger de novo review.  As set forth below, both of its arguments fail.

We start by describing what appears to be a correct understanding of the statutory framework for agency decisionmaking and judicial review regarding TCR.  In discussing that framework, the City contends—and for purposes of this appeal, we agree—that an agency's threshold determination of whether materials qualify as discretionary TCR is subject to judicial review under the deferential substantial evidence standard.  (See § 21074(a)(2) [existence of TCR is "determined by the lead agency, in its

38

discretion and supported by substantial evidence"].)[15]  Once an agency determines the TCR that exist in a project area, as Koi Nation contends and the City acknowledges, the demanding "fair argument" standard governs the agency's determination of whether the mitigation measures in an MND suffice to protect that TCR.  That standard, as Koi Nation emphasizes, sets "a low threshold" for requiring an environmental impact report (EIR).  (*Sierra Club v. California Dept. of Forestry & Fire Protection* (2007) 150 Cal.App.4th 370, 381.)  An agency applying the fair argument standard to assess the adequacy of mitigation measures may not weigh evidence:  "If there [is] substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR."  (*Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1112.)  And courts review de novo whether an agency correctly applied the fair argument standard, i.e., whether the record contains substantial evidence supporting a fair argument that, despite an MND's mitigation measures, a project may significantly affect the environment.  (See *Protect Niles v. City of Fremont* (2018) 25 Cal.App.5th 1129, 1139.)

But the "fair argument" standard of agency decisionmaking—and the ensuing de novo standard of judicial review—comes into play only if a project threatens to significantly impact a part of "the environment."  (*Berkeley Hillside Preservation v. City of Berkeley*, *supra*, 60 Cal.4th at p. 1115.)  Assembly Bill No. 52 expanded CEQA's definition of "the environment" to

---

[15] We need not address the standard of review for a decision whether materials qualify as mandatory TCR.  (§ 21074, subd. (a)(1).)  The only materials for which Koi Nation has adequately developed an argument that they are mandatory TCR are the buried sites; the City agrees the sites contain TCR; and which *type* it is—mandatory or discretionary—does not matter.

include TCR. (See § 21084.2 ["a substantial adverse change in the significance of a [TCR] is . . . a significant effect on the environment"].) While the fair argument standard thus applied to the City's review of the adequacy of mitigation measures to protect the TCR determined to exist in a project area, and while we review de novo the City's assessment of that issue, Koi Nation has not shown that the fair argument standard, or a de novo standard of judicial review, applies to an agency's threshold, discretionary determination whether materials *qualify as* TCR under section 21074(a)(2).

Koi Nation's opening brief implicitly recognized as much, stating, "*Once the existence of TCR is established*, the fair argument standard applies to whether the Project may have a significant effect on them" (italics added), and quoting by analogy a decision holding that "once [a] resource has been determined to be a historical resource, then the fair argument standard applies." (*Valley Advocates v. City of Fresno* (2008) 160 Cal.App.4th 1039, 1072. Nonetheless, the Tribe sought in effect to bring all the parties' disputes within the favorable ambit of the demanding fair argument standard, and the resultant de novo standard of judicial review. To do so, it noted that the City checked boxes in the Environmental Checklist Form indicating that the project may affect both mandatory and discretionary TCR, and it asserted that the City never specified, in its administrative proceedings, what TCR it had determined to exist in the project area.[16] Therefore, Koi Nation argued, we should disregard the City's "litigation position" that it had found no TCR in the project area other than the buried sites, and hold that "[e]ither (1) the

---

[16] The MND, and the administrative record as a whole, in fact make clear that the City determined the buried sites to be the only TCR in the project area—and that Koi Nation understood and forcefully challenged that determination in the administrative proceedings.

vague MND declares that there are TCR throughout the Project site, or (2) the City's failure to lawfully determine whether there are TCR should establish a presumption that the resources Koi Nation identified are TCR." While Koi Nation admittedly had no authority for this proposal, it argued as if we would accept the proposal, treat as TCR everything it had so labeled, and thus review de novo whether substantial evidence in the administrative record supports a fair argument, as to each of the "presumed" TCR "throughout the [p]roject [area]," that the mitigation measures are insufficient to protect it. We decline to do so.

In response, the City contended that Koi Nation had conflated the standards for determining whether TCR *exist* with those for deciding whether, if so, an MND suffices *to protect them*. An agency must first determine if TCR exist; only then need it decide if an MND permits a significant impact on those TCR; and only the latter issue, the City argued, is subject to the fair argument standard. For those propositions, the City cited decisions establishing such an analytic framework for the analogous CEQA category of historical resources. (*Valley Advocates v. City of Fresno*, *supra*, 160 Cal.App.4th at pp. 1068–1072 [fair argument standard did not apply to threshold question whether resource qualifies as historical resource, which is reviewed for substantial evidence]; accord, *Friends of Willow Glen Trestle v. City of San Jose* (2016) 2 Cal.App.5th 457, 466–469; *Citizens for the Restoration of L Street v. City of Fresno* (2014) 229 Cal.App.4th 340, 369.)

In its reply brief (which is less than clear), Koi Nation never squarely concedes that the fair argument standard applies *only* to the question of whether an MND's mitigation measures suffice to protect the identified TCR, and not to the threshold question of what materials qualify as TCR. But if Koi Nation meant to dispute the point, and to contend that the fair argument

41

standard *does* apply to a determination of what qualifies as TCR, it forfeited the issue by not adequately developing an argument to that effect. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 (*Allen*).)

Koi Nation seems instead to argue in its reply that section 21074(a)(2) requires an agency to determine that materials constitute TCR whenever a Tribe offers substantial evidence that they do. This argument, if accepted, would subject an agency's determination of what TCR *exist* in a project area to the same de novo review as its application of the fair argument standard to assess the adequacy of mitigation measures to *protect* those TCR: The validity of a TCR determination would depend on whether the record contained substantial evidence supporting the Tribe's claim, and whether a record contains substantial evidence of a proposition is a question of law. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570; *Protect Niles v. City of Fremont*, *supra*, 25 Cal.App.5th at p. 1139.)

Koi Nation has forfeited this argument by not raising it until its reply brief. (*Allen, supra*, 234 Cal.App.4th at p. 52.) Its opening brief did not address the standard of judicial review of an agency's determination of whether material qualifies as TCR under section 21074(a)(2). Instead of asking us to conclude that the City erred in making such a determination— and identifying the standard of review governing our analysis—it contended only that we should "presume that the City's [asserted] silence" as to the TCR it identified "means that the City's TCR determination in its MND includes all of the TCR that Koi Nation identified," or we should "decide that the City's failure to explain which TCR the MND refers to was an abuse of discretion" and vacate the MND. Alternatively, the Tribe argued that the City abused its discretion as a matter of law by applying incorrect legal standards to determine the TCR present (an adequately raised argument that we discuss

42

below).  Because Koi Nation has not adequately developed any contrary argument, we accept for purposes of resolving this appeal the City's position that we review for substantial evidence a determination as to whether materials qualify as discretionary TCR pursuant to section 21074(a)(2).

> b.      *Overview: The Five Categories of Claimed TCR at Issue*

The parties' disputes about the City's determination of what TCR are present in the project area concern five categories of agreed or claimed TCR: (1) the TCR undisputedly present in the buried sites; (2) undiscovered TCR assertedly buried between the two sites, based on Dr. Parker's "suggest[ion]" that they "may be" one larger site; (3) obsidian artifacts and flakes in redeposited fill on the project area's surface, which the City determined do not constitute TCR based on Dr. White's explanation that they lack the integrity required to satisfy the section 5024.1(c) criteria; (4) obsidian and other materials found by tribal monitors during the spring 2022 construction of the access corridor, mainly in that corridor but, in one case, within the project area; and (5) unspecified potential TCR that the Tribe infers, from the nature of the project area and the evidence in the four preceding categories, "could be . . . anywhere on the project site" and are "likely to be discovered" during construction.

> c.      *The buried sites undisputedly constitute TCR*

While the parties dispute whether the buried sites are mandatory or discretionary TCR, it does not matter.  The parties agree that the sites warrant protection as historical and/or archaeological resources and as TCR. Whichever "type" of TCR they contain, the City's resultant legal duties are the same, as is the applicability of the fair argument standard to its determination that the mitigation measures reduce to insignificance the project's likely effects on the sites.  (See pp. 4, 39, *ante.*)

43

d.    *The City did not abuse its discretion in determining what TCR are present in the project area.*

Koi Nation contends that, insofar as the City had discretion to identify TCR, it applied incorrect legal standards in exercising that discretion and, given the evidence shared in consultation, abused its discretion by finding no TCR outside the buried sites.  We disagree.

i.    *Koi Nation has not overcome the presumption that the City applied the correct legal standards*

Koi Nation's first two argument headings—"The Legislature Enacted Standards [for] Identifying TCR . . . Different Than [Those for] Historical or Archaeological Resources" and "The City Must Consider . . .  the Significance of a Resource to Koi Nation When Applying the CRHR Criteria"—state undisputed principles.  But insofar as the Tribe treats TCR standards as wholly distinct from those for historical resources, it is mistaken. Section 21074(a)(2) expressly incorporates by reference the section 5024.1(c) criteria for historical resources and *requires* an agency to apply those criteria in exercising its discretion to determine what qualifies as TCR.  In applying the criteria, the agency must simultaneously "consider the significance of the resource to [the] tribe."  (§ 21074(a)(2).)  In undertaking that task here, the Tribe contends, the City abused its discretion by applying two "incorrect legal requirements for a TCR determination."  (Capitalization omitted.)  As to each, we disagree.

The first is that "the City Council received incorrect legal advice which likely resulted in the City's failure to analyze TCR in its MND."  While the City Attorney read the full definition of TCR in section 21074 to the Council at the outset of his legal analysis, Koi Nation notes, when he later applied that definition to Koi Nation's claims that obsidian artifacts in fill constitute TCR, he paraphrased the first sentence of subdivision (a)(2) ("whether to

44

classify these types of objects as TCR is within the discretion of the lead agency and must be supported by substantial evidence") but not the second ("In applying the [section 5024.1(c)] criteria . . ., the lead agency shall consider the significance of the resource to [the] tribe").

This omission does not establish a prejudicial abuse of discretion. It is a bedrock presumption "that official duty has been regularly performed." (Evid. Code, § 664.) The City Attorney read to the City Council all of section 21074(a)(2), including its requirement that "[i]n applying the criteria set forth in [section 5024.1(c)] for the purposes of this paragraph, the lead agency shall consider the significance of the resource to a . . . tribe." Moreover, Dr. White repeatedly emphasized to the Council, from an articulate lay perspective, that while he had concluded as an archaeologist that artifacts in foreign fill do not satisfy the section 5024.1(c) criteria for historical resources, Koi Nation's "concerns pertain to the cultural materials . . . within those transported materials" and he did not "speak to the issue of [TCR], which is the province of the tribe under AB 52." The omission noted by Koi Nation thus cannot overcome the presumption that the City Council regularly performed its official duty to apply governing law. (See *California Clean Energy Committee v. City of San Jose* (2013) 220 Cal.App.4th 1325, 1342 [applying presumption to City Council's approval of EIR].)

Koi Nation's second theory of how the City Council applied "incorrect legal requirements" concerns its consideration of Dr. White's finding that obsidian artifacts in redeposited fill cannot qualify as historical or archaeological resources. Koi Nation asserts that the City's counsel "stated that Dr. White's findings about historical resources were sufficient for the City to conclude that the resources 'are not considered TCR under Section [21074(a)(2)]' " even though "the criteria applied to historical

45

resources do not include the requirement to [consider] the significance of the resource to Koi Nation"; that Councilmember Slooten stated "that the standard he applied was whether the TCR have any integrity"—which Koi Nation deems "a condition for Dr. White's historical resources analysis, but not for TCR"; and that, although White said that his assessment of the significance of historical resources was " 'exclusive to the archeological interpretation,' " and that he was " 'not in a position to define what [TCR] are,' " the City Attorney told the Council, without further analysis, that " 'these redeposits did not constitute cultural resources.' " Koi Nation contends, in sum, that counsel inaccurately advised the City Council that it could rely *solely* on Dr. White's application of the historical resources criteria in assessing what qualified as TCR.

This argument fails. First, the City Attorney did not advise the City Council that it could rely *solely* on Dr. White's analysis of whether the materials qualify as historical or archeological resources, while disregarding the materials' cultural significance to the Tribe, and second, the attorney did read the entirety of section 21074(a)(2), including the directive that, "In applying the criteria set forth in that other section [i.e., section 5024.1(c)], for purposes of this paragraph, the lead agency shall consider the significance of the resource to a California Native American tribe."

Insofar as Koi Nation suggests that Dr. White's historical resources analysis as a whole was *irrelevant* to an assessment of whether obsidian in fill constituted a TCR, or somehow improper for the City Council to consider, it is incorrect. Section 21074(a)(2) requires a lead agency, in assessing whether materials qualify as TCR, to determine if the materials are "significant pursuant to criteria set forth in [section 5024.1(c)]," the criteria for historical resources. (§ 21074(a)(2).) Insofar as Koi Nation contends more

46

particularly that Dr. White's application of the integrity requirement for historical resources involved "a condition for . . . historical resources analysis, but not for TCR," it has, as set forth in the margin, forfeited the argument by failing to develop it. (See *Allen, supra*, 234 Cal.App.4th at p. 52 [appellant must support claims of error with meaningful argument and citation of authority; if not, we may treat point as forfeited rather than develop the argument for the litigant].)[17]

_____

[17] As noted, the section 5024.1(c) criteria define how materials qualify as "historical resources" eligible for listing in the California Register of Historical Resources, an "authoritative guide" to "the state's historical resources" overseen by the State Historical Resources Commission (§§ 5020, 5020.4, subd. (a)(3), (8); 5024.1, subd. (a).) The Register includes "historical resources determined by the commission, according to procedures adopted by [it], to be significant and to meet the criteria in [§ 5024.1(c)]." (§ 5024.1, subd. (b).) The Commission has issued regulations implementing section 5024.1(c). (Cal. Code Regs., tit. 14, § 4850 et seq.). Section 4852 of those regulations defines "integrity" and provides that, to be eligible for listing in the Register, resources "must meet one of the [§ 5024.1(c)] criteria" and must have sufficient integrity, which means primarily that materials "retain enough of their historic character or appearance to be recognizable as historical resources and to convey the reasons for their significance," an issue that is "evaluated with regard to the retention of location, design, setting, materials, workmanship, feeling, and association." (*Id.*, § 4852(c)).

Dr. White repeatedly explained to the City Council, in its initial hearing, that he had determined that obsidian artifacts and flakes in redeposited fill could not qualify as historical resources eligible for listing in the Register because, having been relocated, they lacked integrity. In a declaration for the continued hearing, Mr. Geary disputed—from a lay rather than a legal perspective—whether integrity should be required for materials to qualify as TCR. Yet Koi Nation's opening brief on appeal included just one sentence in which it noted one councilmember's comment that he was applying the integrity requirement, as to which the Tribe asserted, without explanation, that the integrity requirement was "a condition for Dr. White's historical resources analysis, but not for TCR." But section 21074(a)(2) defines discretionary TCR as materials "determined . . . to be significant pursuant to criteria set forth in [section 5024.1(c)]," and the regulations that

47

The City Attorney correctly advised the Council, in sum, that it was required to assess whether claimed TCR are significant pursuant to the statutory criteria for historical resources (§ 21074(a)(2), incorporating by reference § 5024.1(c)), and that, in applying those criteria, it was required to

implement the section 5024.1(c) criteria require materials to have "integrity" to qualify as historical resources. (Cal. Code Regs., tit. 14, § 4852(c).) Yet the Tribe never cited those regulations, let alone demonstrated why it would be improper to rely on them in applying the section 5024.1(c) criteria that they implement, and which CEQA required the City to apply to determine what materials qualify as TCR. (We note in particular that the Tribe never contends that section 21074(a)(2)'s command to apply "the criteria set forth in [section 5024.1(c)]" incorporates by reference only the *text* of section 5024.1(c), and not also the *regulations* guiding the application of that text, as promulgated by the agency charged with doing so.)

In its reply brief, Koi Nation belatedly attempts to argue that "the City's requirement for historical integrity is misplaced." (Capitalization omitted.) But it still does not cite section 4852(c), the regulation implementing section 5024.1(c) that defines, and requires historical resources to possess, integrity. As part of this belated argument, the Tribe suggests for the first time that Dr. White may have misapplied the integrity requirement—which it describes by citing *federal* law—and that obsidian in redeposited fill may in fact retain integrity. The Tribe has not only forfeited this subsidiary argument, but failed to administratively exhaust it. Before the City Council, the Tribe argued only that White's application of the integrity requirement should not be considered *relevant* to the identification of TCR, not that his application of the requirement was *incorrect* on its own terms.

The Tribe has thus forfeited any challenge to the City's reliance, in assessing whether material in fill constitutes TCR, on Dr. White's application of the integrity requirement. "It is the responsibility of the appellant . . . to support claims of error with meaningful argument and citation to authority. (Cal. Rules of Court, rule 8.204(a)(1)(B); [citation].) When legal argument with citation to authority is not furnished on a particular point, we may treat the point as forfeited and pass it without consideration. [Citations.] . . . We are not required to examine undeveloped claims or to supply arguments for the litigants. [Citations.] [¶] Moreover, we do not consider points raised for the first time in the reply brief absent a showing of good cause for the failure to present them earlier." (*Allen, supra*, 234 Cal.App.4th at p. 52.)

48

"consider the significance of the resource to [the] tribe." Dr. White's analysis was directly relevant to the first of the two issues that section 21074(a)(2) required the Council to consider. Koi Nation has not shown that the City abused its discretion in relying on that analysis.

> ii. *The City did not abuse its discretion in identifying TCR*

The ultimate issue is whether the City abused its discretion in reaching its determination under section 20174(a)(2) that the lack of integrity of the obsidian artifacts and flakes in remote fill warrants a conclusion that the material does not qualify as TCR. The statute expressly commits the resolution of what qualifies as TCR to the City's "discretion" and limits our review to whether its determination rests on "substantial evidence." (§ 21074(a)(2).) In conducting such review, " '[w]e do not weigh conflicting evidence, as that is the role of the public agency. [Citation.] Rather, we review the administrative record to see if it contains evidence of ponderable legal significance that is reasonable in nature, credible, and of solid value, to support the agency's decision.' " (*Nassiri v. City of Lafayette* (2024) 103 Cal.App.5th 910, 920–921.) "If substantial evidence in the record supports the City's finding, we must uphold it," even if other evidence would support a different conclusion. (*Id.* at p. 921.)

Section 21074(a)(2) permits an agency to determine that materials constitute TCR only if it finds them "significant pursuant to criteria set forth [section 5024.1(c)]," and Dr. White's finding that the materials' lack of integrity keeps them from satisfying the section 5024.1(c) criteria—a finding not challenged below, and challenged only belatedly and inadequately on appeal (see pp. 46–47 & fn. 17, *ante*)—is substantial evidence supporting the City's determination. While Koi Nation presented evidence of the materials' cultural significance to them that would have enabled the City, in applying

49

the section 5024.1(c) criteria while "consider[ing] the significance of the resource to [the] tribe" (§ 21074(a)(2)), to reach a different determination, that does not mean that substantial evidence fails to support the determination the City did make. (*Nassiri v. City of Lafayette, supra*, 103 Cal.App.5th at p. 921.) Our review is thus at an end.

To argue otherwise, Koi Nation emphasizes Dr. White's repeated comments disclaiming expertise in what constitutes TCR and noting that, in effect, a tribe is the expert in what is culturally significant to it. Expanding on this idea, Koi Nation contends that the City "should not have given weight to Dr. White's non-expert opinion about TCR," and that "[t]he only expert opinion about TCR in the record is from Koi Nation's representatives." Insofar as Koi Nation thereby implies that section 21074(a)(2) required the City to consider only the views of tribal representatives in exercising its discretion to determine what constitutes TCR, it misreads the statute. Section 21074(a)(2) requires an agency to "consider the significance of the resource to [the] tribe"—not to "consider [*only*] the significance of the resource to [the] tribe."

Insofar as Koi Nation means that the City should not have given weight to Dr. White's expert opinions in any part of the process of determining what qualifies as TCR, its argument disregards the plain language of section 21074(a)(2). Using the term "expert" in the same loose fashion as the parties to mean knowledgeable, Dr. White is an "expert" in whether a resource satisfies the section 5024.1(c) criteria for historical resources eligible for the California Register of Historical Resources, while Koi Nation and its Tribal Historic Preservation Officer are "experts" in "the significance of the resource to a California Native American tribe." (§ 21074(a)(2); see § 21080.3.1, subd. (a) [tribes "traditionally and culturally

50

affiliated with a geographic area may have expertise concerning their [TCR]"].)  Section 21074(a)(2) requires an agency to determine whether a resource constitutes a TCR by simultaneously considering *both* the area of Dr. White's expertise ("applying the criteria set forth in [section 5024.1(c)]" (§ 21074(a)(2))) *and* the area of the Tribe's expertise ("the significance of the resource to [the] tribe" (*ibid.*)).  The statute thus not only allowed but required the City to consider the issue on which White offered an expert opinion.  The statute commits the task of jointly considering those disparate areas of expertise to the agency's "discretion," as "supported by substantial evidence."  (§ 21074(a)(2).)  Substantial evidence supports the City's exercise of that discretion here, so Koi Nation's submission of substantial evidence that could have supported a different exercise of that discretion is immaterial.

Koi Nation further contends that the City abused its discretion by failing to determine that other forms of evidence warrant a determination that materials outside the buried sites constitute TCR.  These include what it describes on appeal as "potential burials"/"a likely burial," "[traditional] medicines and cultivated resources," and "lineal land tracts" and/or a "tribal cultural landscape."  But Koi Nation's opening brief merely notes those asserted forms of TCR in a laundry list; it falls well short, as to each, of developing an argument showing that the City lacked substantial evidence to support its exercise of discretion to determine either that they did not exist or that they did not qualify as TCR (§ 21074(a)(2)).[18]  (See *People v. Stanley*

_____

[18] As to "potential burials," Koi Nation cites no evidence of oral history or tribal knowledge—only the recollection of Batsulwin Brown, who is not Koi, having decades earlier seen a construction site where excavation had uncovered burials.  As we have described, the record includes Dr. White's report of how he investigated potential sources of records of such construction in the project area and physically investigated the area with Koi Nation members (including the one Brown had told his recollection).  White's report

51

(1995) 10 Cal.4th 764, 793 [appellant cannot simply state facts in their brief and "assume this court will construct a theory" supporting relief].)

Koi Nation also relies on Dr. Parker's report stating, "It is *suggested* here that these two sites *may be* a single site . . . ." (Italics added.) But Parker's tentative suggestion cannot support a conclusion that the City abused its discretion to determine whether TCR exist outside the buried sites by relying instead on White's report—which detailed the thorough investigation by which, with Koi Nation representatives participating, he determined the sites' boundaries—as well as his later report refuting Parker's "suggest[ion]."[19]

In its reply brief, Koi Nation claims the buried sites are evidence that TCR exist elsewhere in the project area.[20] To support its claim that the City

---

of finding no evidence to corroborate Brown's belief that the project area was the site of the long-ago construction is substantial evidence supporting a determination that "potential burials" are not TCR on the project site.

As for land tracts, it is undisputed that they were a system for giving families use rights and stewardship over parts of Koi territory, and that the Koi and neighboring tribes recognized such tracts throughout the lands around Lower Lake. While Geary discussed the role of the land tract system in managing important resources, Koi Nation has not explained how the fact that the project area lay within one of its many land tracts makes the project area itself—as opposed to the former social institution—a "tribal cultural resource." Geary alleged no traditional knowledge that the specific tract(s) that encompassed the project area played a unique role, distinct from that of any other land tract, in Koi history.

[19] The tribe briefly asserts on appeal that the City could have used ground-penetrating radar, but it has not developed an argument showing that such an approach would be effective or affordable, let alone that the City abused its discretion in not pursuing that approach.

[20] In its opening brief, Koi Nation also stated in passing that tribal monitors "discovered [alleged] TCR on the Project site outside of the City's prescribed monitoring area," citing a passage in Geary's declaration asserting

52

must provide mitigation measures to protect undiscovered TCR that might be present, Koi Nation cites *Gentry v. City of Murrietta* (1995) 36 Cal.App.4th 1359. It describes the opinion as holding that a biological report, which "did not find Stephens' kangaroo rats on [a] project site" but "did find evidence that they *could be* present, including droppings and burrows" (italics added), amounted to substantial evidence that mitigation was needed. This misdescribes *Gentry*. The report in fact stated that "no . . . Stephens' kangaroo rats were *observed* at the Project site. However, burrows and droppings indicated that Stephens' kangaroo rats *were present*." (*Id.* at p. 1409, italics added, fn. omitted.) The court, in sum, required mitigation measures for resources that "were present," not ones that only might be present.[21]

---

without elaboration that monitors found TCR on the Project site, outside of the buffer zone, while monitoring construction of the access corridor. Koi Nation did not further discuss the nature or location of the asserted "TCR"; as the City noted in its respondent's brief, Geary's map showed dots referring to two discoveries of unspecified "TCR" in the corridor and one in the project area. Koi Nation's reply adds no detail. It thus has not adequately developed an argument that any materials found in the project area—despite *not* having led monitors to halt construction—were sufficiently "significant pursuant to [the section 5024.1(c)] criteria," considered in light of "the significance of the resource to [the] tribe" (§ 21074(a)(2)), to qualify as TCR, or to support an inference of buried TCR.

[21] Koi Nation also cites *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918, as holding that "an EIR 'must discuss potential [resources] . . . when there is credible evidence that [the resource] might be present on a project site,' " but this quotation is inapt. The term Koi Nation has replaced with "[resources]" and "[the resource]" is "ESHA," which means "environmentally sensitive habitat areas (ESHA) *under the California Coastal Act of 1976.*" (*Id.* at pp. 938, 924, italics added.) In the circumstances of *Banning Ranch Conservancy*, only the Coastal Commission had authority to determine if an area was an ESHA. (*Id.* at p. 938 & fn. 6.) The city had contended that, because it could not determine if parts of a

Here, persons affiliated with each party acknowledged a possibility that the project area contains as-yet-undiscovered, buried TCR, like that discovered by Dr. White in the buried sites, given how long the Koi have lived by Clear Lake and the attractiveness of the project area. Dr. White conceded that "something could be anywhere in any gaps between my trenches"; Vice Mayor Claffey stated that while the City took steps "to mitigate what we believe is known," there is "a level of unknown here"; tribal monitor Rob Morgan said that, given the importance of streams and fish to his ancestors, the idea that the only TCR buried in the area between the two streams is the TCR already discovered in the two buried sites was "crazy"; and Geary said, "Our concerns are in the areas where they haven't [yet] found anything," but where he was confident that construction would unearth further TCR.

The provisions added to CEQA by Assembly Bill No. 52, however, require protection only for TCR determined to be present in a project area—not unknown TCR that might be present but that diligent investigation has not revealed. (§ 21074, subd. (a).) While Koi Nation's desire for mitigation measures to protect as-yet-undiscovered TCR that might be buried in "areas

---

project site qualified as ESHA, it could simply ignore the presence of potential *and known* ESHA in drafting an EIR. (*Id.* at pp. 936–937.) Noting CEQA's mandate to "integrate [its] requirements . . . with planning and environmental review procedures otherwise required by law" so the procedures can run concurrently (§ 21003, subd. (a)), the Court held only that the city had been obliged in its EIR to "discuss potential ESHA and their ramifications for mitigation measures and alternatives when there is credible evidence that ESHA might be present on a project site" (*id.* at p. 938)—an issue the city lacked authority to resolve. It did not hold that a city must include mitigation measures for a type of resource whose presence the city does have authority to determine—like TCR—just because the city cannot, even with diligent investigation, exclude all possibility that such resources *might* lie undiscovered somewhere beneath a project area.

where they haven't found anything" is understandable, the Tribe has not shown that such *potential* TCR trigger the protections of CEQA at issue.

2. *Koi Nation Has Not Shown the Mitigation Measures Are Inadequate*

Koi Nation contends that, for several reasons, the MND's mitigation measures are insufficient to reduce the project's potential impacts on TCR to a point where, as the use of an MND requires, "clearly no significant effect on the environment would occur." (*Save Agoura Cornell Knoll v. City of Agoura Hills* (2020) 46 Cal.App.5th 665, 690 (*Agoura Hills*).) In large part, this argument fails because it depends on an assumption that the project area contains a broader range of TCR than the City determined it to contain, in an exercise of discretion supported by substantial evidence (as we have just discussed). Insofar as Koi Nation focuses on the adequacy of the City's mitigation measures for the TCR determined to be present in the project area—i.e., the buried sites—the claim fails for want of exhaustion.

a. *Koi Nation Did Not Administratively Exhaust Its Claim that the City Improperly Deferred the Formulation of Mitigation Measures*

In adopting the MND, Koi Nation contends, the City violated the rule that "[f]ormulation of mitigation measures shall not be deferred until some future time" (Guidelines, § 5126.4, subd. (a)(1)(B)). (See, e.g., *Agoura Hills*, *supra*, 46 Cal.App.5th at pp. 686–687.) Noting that mitigation measure TCR-1 requires the City to "prepare a [TCR] preservation plan that delineates the boundary of CCL-21-01 and CCL-21-02, describes the necessary combination of materials and culturally sterile fill in capping, . . . ," the Tribe contends that CEQA required the City to fulfill that requirement—i.e., to "delineate[] the boundary of [the buried sites]" and identify the "combination of materials and culturally sterile fill" it would use to cap those sites—*before* adopting an

55

MND, rather than defer finalization of the plan to an unspecified future time. The City responds that the Tribe failed to administratively exhaust a claim that the mitigation measures reflect an improper deferral of specificity. (§ 21177, subd. (a) [barring CEQA action unless alleged grounds for noncompliance "were presented to the public agency . . . before the close of the public hearing on the project before the issuance of the notice of determination"]; *Agoura Hills*, at pp. 676–677 [" ' " [e]xhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action' " ' "].)  Our review of the record supports the City's view, as neither in Koi Nation's written comments before the final Planning Commission hearing, nor in its appeal letter to the City Council, nor at the 2023 hearings before those bodies did it claim that the mitigation measures reflected an improper deferral of specificity.

Further, in response to the City's argument on appeal that it did not exhaust this claim, Koi Nation's reply brief says nothing:  It never acknowledges the argument, let alone cites a part of the administrative record we might have overlooked showing that it *did* exhaust the issue.  We may thus treat the Tribe as having implicitly conceded that the City is correct:  It failed to exhaust its claim of improper deferral.  (See, e.g., *Wisner v. Dignity Health* (2022) 85 Cal.App.5th 35, 45 [appellant "fails to respond to [respondent]'s forfeiture argument in his reply brief on appeal, tacitly conceding its merit"]; *Campbell v. Ingram* (1918) 37 Cal.App. 728, 732 [if appellant "has not deigned to reply" to respondent's argument, we may assume they find it "unanswerable"]; cf. *Agoura Hills, supra*, 46 Cal.App.5th at p. 678 [CEQA petitioners did not forfeit exhaustion claim because, after City argued that they had not shown exhaustion, they "responded to this

argument in their reply brief by . . . citing the portions of the administrative record" assertedly showing exhaustion].)[22]

### b. *Koi Nation Has Not Shown that the Mitigation Measures for the Buried Sites are Inadequate*

Because the buried sites undisputedly contain TCR, we can uphold the MND only if its mitigation measures reduce the project's likely effects on the sites " ' " ' "to a point where clearly no significant effect on the environment would occur" and there is no substantial evidence that the project as revised may have a significant effect.' " ' " (*Friends of Riverside's Hills v. City of Riverside* (2018) 26 Cal.App.5th 1137, 1150.) As noted, the City was obliged to make that determination using the fair argument standard, and we review its application of that standard de novo. (*Agoura Hills*, *supra*, 46 Cal.App.5th at p. 689.) To show that the mitigation measures do not satisfy that standard as to the buried sites, Koi Nation contends that the City adopted inadequate "half-measures" and rejected ones the Tribe proposed, but it offers just one example of a mitigation measure that it purportedly proposed, and the City

---

[22] Koi Nation's reply brief makes a blanket assertion that, given the "limited remaining space" after it devoted 27 pages to the arguments that it chose to make, it "cannot respond" to all the City's contentions, yet "does not admit or waive any issues not specifically addressed in this Reply." This is no substitute for fulfilling a litigant's duty to support its contentions—and refute its opponent's—by developing arguments that cite the record and authority. (Cal. Rules of Court, rule 8.204(a)(1).) Even if Koi Nation did not intend to concede that the City is right about exhaustion, and thus did not *waive* its improper-deferral claim, its failure to cite the record to show exhaustion of the claim nonetheless *forfeits* it. (*Alki Partners, LP v. DB Fund Services, LLC* (2016) 4 Cal.App.5th 574, 589 [failure to cite record "forfeits the issue or argument on appeal . . . presented without the record reference"]; see *People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 9 [distinguishing waiver from forfeiture].)

purportedly rejected: "expanding the buffer for cap-and-fill over the known [buried sites], because the boundaries were not well defined."

Koi Nation's claim that it made, and the City Council rejected, a proposal to "expand[ ] the buffer *for cap-and-fill* over the known [buried sites]" (italics added) misstates the record. What Koi Nation's counsel asked the City Council to do, at the cited page of the initial hearing transcript, was "extend that buffer zone *for monitoring* to the site boundaries." ~(AR 4067)~ (Italics added.) It was one of counsel's many iterations of the central request on which the Tribe all-but-exclusively focused at the Planning Commission and City Council hearings: to expand the area in which the City would pay for *tribal monitoring*—not to expand the area it would *cap and fill*—from the buried sites (plus a buffer zone) to the entirety of the 25-acre project area.[23]

Koi Nation's briefs provide no examples of the inadequate "half-measures" it asserts the City adopted, or of necessary measures that Koi Nation assertedly proposed, and the City rejected. The Tribe thus has not developed an argument sufficient to show a fair argument that the MND's mitigation measures—which call for capping and filling the buried sites containing TCR, allowing only park/open space above the sites, and paying for tribal monitoring during ground-disturbing activities within 100 feet of

---

[23] In consultation, the City rejected the tribe's proposed buffer area of "25 feet in any direction" for capping and filling the buried sites, counter-proposing the use of "an appropriate buffer" of a size based on adjacent land use and topography. After the City declared consultation concluded, and included in the final draft MND a mitigation measure that calls for using a 15-foot buffer when capping and filling the buried sites, the tribe did not challenge the size of the cap-and-fill buffer in its arguments to the Planning Commission and City Council, instead focusing all but exclusively on its request for paid monitoring throughout the project area. It thus failed to administratively exhaust any challenge to the adequacy of the size of the buffer area for the cap-and-fill mitigation measure.

the sites and the area between them—are insufficient to reduce the project's likely impacts on the TCR in those sites to insignificance.

Koi Nation also argues, without substantiation, that "[m]uch of the City's deficient mitigation closely parallels *Agoura Hills*[, *supra*, 46 Cal.App.5th 665]." That case involved, like this one, an MND issued for a project in an area including a buried site containing TCR. (*Id.* at p. 682.) The Second District held that an archaeologist's opinion about the project's likely effects on the site amounted to substantial evidence supporting a fair argument that the mitigation measures in the MND failed to reduce the project's potential effects on the TCR to insignificance. (*Id.* at p. 689.) In so holding, Koi Nation stresses, the court rejected the city's claim that, because the archeologist had not personally investigated the site, his opinions did not constitute substantial evidence; in addition, the court stated that the agency could not, in deciding to issue an MND, weigh conflicting evidence of the mitigation measures' adequacy. (*Ibid.*) Here, Koi Nation contends, Dr. Parker's suggestion as to the possible boundaries of the buried site(s) conflicted with Dr. White's opinion, and rested on greater investigation than the archeologist's opinion in *Agoura Hills*; the adequacy of the City's cap-and-fill mitigation measure depends on accurately identifying the boundaries of the area to be capped and filled (i.e., the boundaries of the buried site(s)); and the City thus could not weigh the experts' views in deciding that the MND's mitigation measures are adequate. We agree with the City that *Agoura Hills* is distinguishable.

The *Agoura Hills* petitioners, unlike Koi Nation, preserved an argument that the city had improperly deferred the formulation of specific mitigation measures, and that argument was the primary basis for the court's holding that the mitigation measures were inadequate. (*Agoura Hills*, *supra*,

59

46 Cal.App.5th at pp. 685–686.)  While the Second District did hold that the city could not weigh conflicting expert evidence in resolving a disputed issue subject to the fair argument standard, it did not frame the disputed issue to which that standard applied as one involving the determination of what TCR were present in the project area, like the disputed issue here.  Rather, the Second District framed the disputed issue as whether the mitigation measures in the MND were adequate to protect the TCR agreed to be present. (*Id*. at pp. 688–690.)[24]  The *Agoura Hills* court thus did not hold that an agency cannot weigh conflicting expert views in making a threshold determination as to what TCR are *present* in a project area (e.g., whether TCR are present between the buried sites).

      c.     *The City Did Not Decline to Pay for Necessary Services in Order to Induce Koi Nation to Provide Them Voluntarily.*

Koi Nation contends that the City tried to "cut corners" and avoid paying for necessary mitigation by asking the Tribe to provide monitors at its own expense for ground-disturbing activities over most of the project area, even though monitoring is a skilled service whose providers the City should

---

[24] "[T]his is not a case where the experts disagreed about whether a proposed project would have a significant effect on the environment," the *Agoura Hills* court stated:  The city's expert "opined that [the buried site] should be avoided, and that [an archeological excavation] should be conducted if avoidance was not feasible," while the expert supporting the tribe "agreed that [excavation] would be required if the project was not reconfigured to avoid the site, but opined that the MND's proposed measure . . . did not provide for an adequate [excavation] program to mitigate the site's loss."  (46 Cal.App.5th at p. 689.)  It was at that point—in discussing whether the MND set forth an adequate excavation program, or whether the developer had improperly deferred the task of defining such a program—that the court added, "Moreover, to the extent there was a conflict in the evidence, ' "neither the lead agency nor a court may 'weigh' conflicting substantial evidence to determine whether an EIR must be prepared in the first instance." ' " (*Ibid*.)

60

pay in the same way it pays plumbers or electricians who provide services required for a project.

This argument, which evokes policy concerns rather than the text of CEQA, is misguided. Koi Nation and the City disagreed about the extent of TCR present—or potentially present—and, thus, about the amount of monitoring required. After consulting with the Tribe and considering its views, the City adhered to its own view that monitoring is not necessary in all the areas the Tribe noted. Respecting the Tribe's concerns, however, the City offered to let it address those concerns by providing monitoring at its own cost in areas where the City had concluded that monitoring was unnecessary. By letting the Tribe voluntarily protect the larger area that it considered at risk, the City did not shirk its duty to fully protect the smaller area it had appropriately determined, under CEQA, to require protection. The City did not try, in sum, to cut corners; it just disagreed with the Tribe about where the corners are.

3. *Koi Nation Has Not Shown that the MND Lacks Required Information*

Koi Nation contends that the MND lacks information CEQA required it to include about the confidential materials the Tribe provided in consultation, including (1) a confidential appendix the City stated it would, but did not, attach and (2) "a general description" of the confidential information, to appear in the MND "for public review" in the comment period (§ 21082.3, subd. (f)). It further contends that the MND offers a cursory, boilerplate conclusion that the project's impact on TCR is not cumulatively significant when its "incremental effects" are viewed "in connection with the effects of past projects, . . . other current projects, and . . . probable future projects" (§ 21083, subd. (b)(2)).

The first argument fails because, as the City notes and Koi Nation in its reply brief fails to refute, the Tribe did not raise it in the trial court. (*Nassiri v. City of Lafayette*, *supra*, 103 Cal.App.5th at p. 933 [applying in CEQA case rule that points not raised in trial court are forfeited on appeal].)

The second argument fails because the City satisfied, as to cumulative impact, the need for "a written statement briefly describing the reasons that a proposed project will not have a significant effect on the environment" (§ 21064).[25] If a project "might contribute to a significant cumulative impact, but the contribution will be rendered less than cumulatively considerable through mitigation measures set forth in [an MND], the initial study shall briefly indicate and explain how the contribution has been rendered less than cumulatively considerable." (Guidelines, § 15064(h)(2).)

Koi Nation, noting that Dr. White described TCR "unearthed from two other City projects with recorded ancestral settlements . . . and deposited on this project site," claims that concurrent city projects also "may impact TCR." But despite the asserted harm to materials previously unearthed and relocated to the project area, Koi Nation has not shown that the City abused its discretion in determining that such materials do not now qualify as TCR.[26]

We agree with the City that this case comes within the rule that if "there is no substantial evidence of any individual potentially significant

---

[25] The MND states that the City identified "[a]ll potentially significant impacts" on resources including TCR, and that its mitigation measures would "avoid or reduce all potential impacts to less than significant levels and . . . not result in cumulatively considerable environmental impacts."

[26] Because the mitigation measures require use of "culturally sterile fill in capping," and bar "removal of cultural soils from the project site," this project will not perpetuate the cycle of displacing cultural soils from one construction site to another to which Koi Nation refers on appeal, and which was a focus of its cumulative-impact arguments below.

effect by a project . . ., the lead agency may reasonably conclude the effects of the project will not be cumulatively considerable." (*Sierra Club v. West Side Irrigation Dist.* (2005) 128 Cal.App.4th 690, 701–702.)

## DISPOSITION

We affirm the judgment.  The City shall recover its costs on appeal.

                             _____

                             Miller, J.

WE CONCUR:

_____

Stewart, P. J.

_____

Desautels, J.

A172741, *Koi Nation of Northern California v. City of Clearlake et al.*